IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 21-cr-00693 |
| | ) | |
| v. | ) | |
| | ) | Judge Sharon Johnson Coleman |
| DARRELL GRIFFIN, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant Darrell Griffin is charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Before the Court is his motion to dismiss the indictment on Second Amendment grounds in light of recent Supreme Court case *New York State Rifle & Pistol Ass'n., Inc. v. Bruen*, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022). For the following reasons, the motion [62] is granted.

**Background**

Griffin's criminal record reflects multiple felony convictions under Illinois law, including robbery and possession of a controlled substance. Therefore, Section 922(g)(1) prohibits Griffin from possessing a firearm.

The indictment at issue states that, on January 12, 2021 Griffin was smoking marijuana in his illegally parked car in Chicago's West Englewood neighborhood. When police encountered Griffin, he possessed a loaded Glock pistol with a defaced serial number. As a result, the government charged Griffin with being a felon in possession of a firearm under Section 922(g)(1). Griffin now moves to dismiss the indictment as unconstitutional in light of *Bruen*, 142 S. Ct. 2111.

**Legal Standard**

Federal Rule of Criminal Procedure 12(b)(1) provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Rule 12 authorizes defendants to challenge the lawfulness of a prosecution on purely legal, as opposed to factual, grounds. *See United States v. Coscia*, 866 F.3d 782, 790 (7th Cir. 2017) (considering defendant's contention that the indictment must be dismissed because the statute under which it is brought is unconstitutionally vague). A court may decide all questions of law raised in a motion to dismiss, including the constitutionality and interpretation of a federal statute. *See United States v. Sorich*, 523 F.3d 702, 706 (7th Cir. 2008).

**Discussion**

    **A. Second Amendment**

The Second Amendment to the United States Constitution states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Second Amendment guarantees the right of "law-abiding, responsible citizens" to keep and bear arms for self-defense. *District of Columbia v. Heller,* 554 U.S. 570, 635 (2008).

In *Bruen,* the Supreme Court announced a new test for analyzing the constitutionality of firearm restrictions. 142 S. Ct. at 2127. First, courts must determine whether the "Second Amendment's plain text covers an individual's conduct." *Id.* at 2129–30. If so, the Constitution presumptively protects that conduct and the burden shifts to the government to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126. Only then may the Court conclude that the "individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (citing *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10, 81 S. Ct. 997, 6 L. Ed. 2d 105 (1961)).

The Seventh Circuit clarified the analysis demanded by *Bruen*'s text-and-history test in considering whether Section 922(g)(1) is constitutional. *See Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023). *Atkinson* explained that the government could successfully defend modern-day arms regulations—especially those "unimaginable at the founding"—by analogy. *Id.* at 1021. The Seventh Circuit made clear that the government need not "pinpoint a dead ringer—a well-established and representative historical *analogue* will do." *Id.* That said, pointing to "only a couple of isolated historical facts and incidents, offering no detail about their application and import[,]" would not suffice. *Id.* at 1022. As further guidance, the Seventh Circuit proposed a set of "interrelated and non-exhaustive questions [that] may help focus the proper analysis:"

1. Does [Section 922(g)(1)] address a "general societal problem that has persisted since the 18th century?" *Bruen*, 142 S. Ct. at 2131. If this problem existed during a relevant historical period, did earlier generations address it with similar or "materially different means?" *Id.*

2. What does history tell us about disarming those convicted of crimes generally and of felonies in particular? Among other sources, the parties could look to commentary from the Founders, proposals emerging from the states' constitutional ratifying conventions, any actual practices of disarming felons or criminals more generally around the time of the Founding, and treatment of felons outside of the gun context (to the extent this treatment is probative of the Founders' views of the Second Amendment). When considering historical regulations and practices, the key question is whether those regulations and practices are comparable in substance to the restriction[s] imposed by [Section 922(g)(1)]. To answer the question, . . . the parties should consider how the breadth, severity, and the underlying rationale of the historical examples stack up against [Section 922(g)(1)].

3. Are there broader historical analogues to [Section 922(g)(1)] during the periods that *Bruen* emphasized, including, but not limited to, laws disarming "dangerous" groups other than felons? The parties should not stop at compiling lists of historical firearms regulations and practices. The proper inquiry, as we have explained, should focus on how the substance of the historical examples compares to [Section 922(g)(1)].

4. If the [parties'] historical inquiry identifies analogous laws, do those laws supply enough of a historical tradition (as opposed to isolated instances of regulation) to support

3

>[Section 922(g)(1)]? On this front, the parties should provide details about the enforcement, impact, or judicial scrutiny of these laws, to the extent possible.
>
>5. If history supports [Griffin's] call for individualized assessments or for a distinction between violent and non-violent felonies, how do we define a non-violent or a non-dangerous felony? And what evidence can a court consider in assessing whether a particular felony conviction was violent? For instance, can a court consider the felony conviction itself, the facts of the underlying crime, or sentencing enhancements? *Bruen* shows that these distinctions should also have firm historical support. *See* 142 S. Ct. at 2132–33 (explaining that the court must assess whether modern and historical regulations are "relevantly similar," including in terms of how and why the regulations burden gun rights).

*Atkinson*, 70 F.4th at 1023–24.

The Supreme Court has not yet applied the historical-tradition analysis to consider the constitutionality of Section 922(g)(1). The Seventh Circuit considered, but did not decide, whether Section 922(g)(1) is constitutional. *Atkinson*, 70 F.4th at 1023–24. Multiple courts in this district have upheld the statute as constitutional following *Atkinson,* though on separate grounds. *See United States v. Agee*, No. 1:21-CR-00350-1, 2023 WL 6443924 (N.D. Ill. Oct. 3, 2023) (Chang, J.) (finding felons are protected under plaint text of the Second Amendment, that Section 922(g)(1) is consistent with this Nation's regulation of firearms, and no historical evidence for as-applied challenge); *United States v. Johnson*, No. 23 CR 156, 2023 WL 6276562 (N.D. Ill. Sept. 26, 2023) (Kendall, J.) (finding felons are not protected under plaint text of the Second Amendment); *United States of America v. Reggie Johnson*, 2023 WL 6690388 (N.D.Ill., 2023) (Durkin, J.) (finding even if felons are protected under Second Amendment, that Section 922(g)(1) is consistent with this Nation's regulation of firearms and no historical evidence for as-applied challenge.); *United States of America v. Lavoia Hardy*, 2023 WL 6795591 (N.D.Ill., 2023) (Kendall, J.) (finding felons are not protected under plaint text of the Second Amendment and no historical basis for as-applied challenge); *United States v. King*, No. 1:23-CR-00143, 2023 WL 7936754, at *1 (N.D. Ill. Nov. 17, 2023) (Bucklo, J.) (finding felons are

protected under the Second Amendment's plain text, historical tradition established, and some historical evidence for as-applied challenge). Other courts in this district, however, have found the statute unconstitutional. *See United States v. Prince*, No. 1;22-CR-00240, 2023 WL 7220127 (N.D.Ill., Nov. 2, 2023) (Gettleman, J) (finding that Section 922(g)(1) is unconstitutional facially and as-applied to felons covered under Second Amendment's plain text and government could not establish historical tradition of firearm regulation); *United States v. Delany*, No. 22 CR 463, 2023 WL 7325932 (N.D. Ill. Nov. 7, 2023) (Gettleman, J) (same); *United States v. Salme-Negrete*, No. 22 CR 637, 2023 WL 7325888 (N.D. Ill. Nov. 7, 2023) (Gettleman, J) (same).

Other circuits are split in deciding Section 922(g)(1)'s constitutionality. *See United States v. Jackson*, 69 F.4th 495, 505 (8th Cir. 2023) (upholding the statute's constitutionality, as applied to a defendant convicted of state law felonies for selling controlled substances); *see also United States v. Dunn*, 76 F.4th 1062, 1068 (8th Cir. 2023) ("[f]ollowing [*Bruen*], this court concluded that the felon-in-possession statute is constitutional, and there is 'no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)'") (quoting *Jackson*, 69 F.4th at 502); *but see Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 98–99, 106 (3d Cir. 2023) (en banc) (finding that the government did not carry its burden of showing that our Nation's history and tradition of firearm regulation support disarming defendant).

With full awareness of these various decisions, the Court first considers whether Griffin's alleged conduct is covered by the plain text of the Second Amendment.

### B. Plain Text of the Second Amendment

Griffin argues that his conduct is covered by the plain text of the Second Amendment. Relying on *United States v. Meza-Rodriguez*, 798 F.3d 664, 672 (7th Cir. 2015), Griffin argues that felons are not excluded from "the people" protected by the Bill of Rights. The government argues that Griffin's conduct is not covered by the Second Amendment because he is not a "law-abiding"

5

citizen of the United States due to his status as a convicted felon, and he is, therefore, not one of the "people" entitled to "keep and bear arms."

The government claims that because *Bruen* repeatedly emphasized that "law-abiding citizens" possess the right to bear arms, the Supreme Court signaled its approval of statutes regulating non-law-abiding individuals' ability to possess firearms. *See* 142 S. Ct. at 2122 ("[W]e recognize that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense."); *id.* at 2134 ("It is undisputed that petitioners [ ]—two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects.").

Prior to *Atkinson*, this Court previously rejected the government's argument in *United States v. Carbajal-Flores*, No. 20-CR-00613, 2022 WL 17752395, at *2 (N.D. Ill. Dec. 19, 2022) (Coleman, J.). This Court found that *Bruen*'s characterization of petitioners as "law-abiding citizens" did not control this Court's interpretation of "the people" covered by the Second Amendment. Similar arguments were made and rejected in *Meza-Rodriguez*, 798 F.3d at 669. The Seventh Circuit did not give weight to the Supreme Court's language in *Heller*, 554 U.S. at 580, linking Second Amendment rights to "law-abiding citizens." *See Meza-Rodriguez*, 798 F.3d at 669. Because *Heller* court did not "attempt to define the term 'people,'" the Seventh Circuit did not restrict the application of the Second Amendment to "law-abiding citizens." *Id.* Since *Bruen* similarly did not address the meaning of "the people," this Court will not "place more weight on these passing references than the Court itself did" by holding that unauthorized noncitizens possess no right to bear arms. 142 S. Ct. at 2134 (holding that it was "undisputed that petitioners … are part of 'the people' whom the Second Amendment protects"); *see also id.* at 2157 (Alito, J., Concurring) (explaining "[o]ur holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a

6

gun."). Nothing in *Atkinson*, which primarily focuses on *Bruen*'s historical tradition test, has caused this Court to depart from its ruling in *Carbajal-Flores*.

Thus, the Court finds that the plain text of the Second Amendment covers all people – including a person convicted of a felony.

### C. The Second Amendment's Historical Tradition of Firearm Regulation

Although the Second Amendment's plain text presumptively protects firearms possession by felons, that does not end the analysis. Under *Bruen*, if the government can show that the felon dispossession statute is part of this country's historical tradition of firearm regulation, then the statute survives. 142 S. Ct. at 2126, 2130.

This Court is disheartened by the Supreme Court's decision to rely on an analysis of laws that existed at this nation's founding to determine the constitutionality of modern gun regulations. Indeed, to interpret modern regulations pertaining to the critically important Second Amendment right to bear firearms for self-defense, the Supreme Court requires that this Court rely on a history and tradition of a nation that at the time would have regarded individuals, including Griffin and this Judge, as three-fifths of a person at best and property at worst. As demonstrated below, the *Bruen* test causes the government to make uncomfortable arguments to justify the constitutionality of modern gun regulations.[1] Regrettably, this Court must acknowledge that *Bruen* is the law. In analyzing this nation's history and tradition of firearm regulation, we address each of the *Atkinson* factors in turn.

---

[1] There is also a significant danger inherent in the *Bruen* test regarding the nature, interpretation, and availability of the historical evidence. In this district alone, in the space of only a few weeks, multiple judges have been asked to adjudicate constitutional rights based on differing historical records. It is alarming that defendants' constitutional rights and freedom might be deprived because an overworked defense attorney was unable to dig a 300-year-old regulation out of the archives.

1. **Whether Section 922(g)(1) Addresses a "General Societal Problem that has Persisted since the Eighteenth Century."**

The government argues that Section 922(g)(1) addresses a "general societal problem that has persisted since the 18th century" in that the statute relates to the disarmament of individuals who, like felons, are untrustworthy adherents to the rule of law. Indeed, it is undisputed that the problems of crime and recidivism have always existed in this nation. The Court is required to conduct the "straightforward historical inquiry" that requires the government to cite evidence of "distinctly similar historical regulation[s] addressing that problem." *Bruen*, 142 S. Ct. 2129.

2. **History of Disarmament of Crimes Generally and of Felonies in Particular.**

Based on the parties briefing, the history is void of the disarmament of those convicted of crimes and felonies. The government relies on *proposed* regulations to show that the Founders understood the Second Amendment to support broad authority to disarm "untrustworthy" groups. The government states that the Pennsylvania Antifederalists proposed a constitutional amendment recognizing that criminal activity can be grounds for disarmament. *See* 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 627, 665 (1971) (stating proposed amendment provided right to bear arms "*unless for crimes committed*, or real danger of public injury") (emphasis added). The government also relies on the Massachusetts Convention, where Samuel Adams proposed an amendment providing that the Constitution shall "never [be] construed . . . to prevent the people of the United States, who are *peaceable citizens*, from keeping their own arms." *Schwartz*, at 675, 681, 758, 761 (emphasis added). None of these proposed amendments became law. Further, the government has failed to show a felon dispossession statute that existed at the founding. Indeed, history tells us that the disarmament of felons did not happen at the nation's founding.

*Bruen*, however, requires "only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* (emphasis in original). In other words, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be

8

analogous enough to pass constitutional muster." *Id.* With that, we turn to the government's historical analogues.

### 3. Broader Historical Analogues to Section 922(g)(1).

The government offers two categories of historical analogues to the modern-day felon-dispossession statute: (1) firearms laws that banned certain groups of "untrustworthy adherents to the law" from possessing firearms; and (2) more general laws that authorized capital punishment and estate forfeiture for felony sentences. The Court notes that nothing in *Bruen* or *Atkinson* requires us to this Court to accept all of the government's historical analogues. We begin by analyzing each group whom the government contends were deemed "untrustworthy" at the founding: Protestants, Catholics, Black enslaved individuals, Native Americans, and British loyalists.

The government relies on the well-worn English collection of historical laws disarming religious minorities to justify categorically disarming felons in the United States today. First, the government relies, in part, on Seventeenth Century English law. *See Bruen*, 142 S. Ct. at 2119; *Heller*, 554 U.S. at 599 (finding English law relevant because the Second Amendment "codified a right inherited from our English ancestors"). The government claims the English government passed a law in 1689 disarming Catholics who refused to make declarations renouncing their faith. [Dkt. 71 at 18]. The government contends that this categorical dispossession stemmed from the distrust of Catholics to obey English law at the time, which was despite the predominance of Protestants in the population. Additionally, the government notes that after the English Civil War, the restored Stuart monarchs disarmed nonconformist Protestants, including many belonging to "pacifist denominations like the Quakers." *Id.* at 19-20; *Range*, 69 F.4th at 120–21 (Krause, J., dissenting) (explaining "Anglicans accused nonconformists of believing their faith exempted them from obedience to the law.").

9

This Court rejects English laws disarming religious minorities as historically analogous to Section 922(g)(1). The core question is whether felon dispossession law and the historical analogue cited by the government "impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Bruen*, 142 S. Ct. at 2133. Here, the early English government enacted these laws solely for discriminatory reasons that would be impermissible today. Thus, the Court finds that the law cannot impose a "comparably justified" burden on the right of armed self-defense. Accordingly, the Court declines to use discriminatory laws based on religion as a foundation for denying Second Amendment rights.

Next, the government relies on this nation's history of explicit discrimination against racial and ethnic minorities to support Section 922(g)(1)'s constitutionality. Amazingly, the Government argues that "firearm regulations directed toward disarming Native Americans and Black people were pervasive" and that these regulations demonstrate the government's historical "authority to disarm classes of people who were not dependable adherents to the rule of law." [Dkt 71 at 21].

The Court is dismayed by the government's continuous reliance on admittedly bigoted and racist laws in these cases. *See Agee*, 2023 WL 6443924 (relying on slavery and laws discrimination against religious minorities in arguing that Section 922(g)(1) is unconstitutional); *Gates*, 2023 WL 5748362 (same); *Johnson*, 2023 WL 6276562 (same). Indeed, the Court would be remiss in failing to point out that the government's characterization of Griffin, a Black man, as an "untrustworthy adherent to the law" would have been the same characterization the founders had about the enslaved Africans. The government essentially expands on *Bruen*'s test to argue that the denial of all constitutional rights at the founding can justify the denial of some constitutional rights today. The government should be careful in "pick[ing] [its] friends out of history's crowd." *Bruen*, 142 S. Ct. at 2180 (Breyer, J. dissenting).

The government demonstrates ignorance and insensitivity toward this nation's history of slavery and the peculiar institution's modern impact on Black Americans. This level of disregard becomes all the more concerning when the realities of how Section 922(g)(1) is enforced against primarily Black Americans is considered.[2] *See United States v. Bullock*, 2023 WL 4232309, at *19 n. 22 (S.D.Miss., 2023) (citing Emma Luttrell Shreefter, *Federal Felon-in-Possession Gun Laws: Criminalizing A Status, Disparately Affecting Black Defendants, and Continuing the Nation's Centuries-Old Methods to Disarm Black Communities*, 21 CUNY L. Rev. 143, 175 (2018) (explaining "'[f]elon in possession' laws . . . are disparately enforced against Black defendants, and federal initiatives that charge offenders in the federal rather than state system target Black communities."); David E. Patton, *Criminal Justice Reform and Guns: The Irresistible Movement Meets the Immovable Object*, 69 Emory L.J. 1011, 1015 (2020) (collecting critiques of federal gun possession prosecutions, "including stark racial disparity, contribution to mass incarceration, harm to principles of federalism, diminished civil liberties, and lack of effectiveness"); *see also* Benjamin Levin, *Guns and Drugs*, 84 Fordham L. Rev. 2173, 2194 (2016) (stating "while fewer published studies focus on the racial dynamics of criminal gun law, the evidence that we do have suggests that people of color bear the brunt of enforcement.")).

Unsurprisingly, this Court rejects the government's reliance on slavery and discrimination toward Native Americans as historical analogues to Section 922(g)(1) given the regulations impermissible premise cannot impose a "comparably justified" burden on the right of armed self-

---

[2] *See also United States v. Bullock*, 2023 WL 4232309, at *19 n. 22 (S.D. Miss., 2023) ("National data on Section 922(g) convictions show that of the individuals convicted of violating Section 922(g), 56.2% of them were Black. U.S. Sent. Comm'n, Quick Facts – Felon in Possession of a Firearm at 1 (June 2022), *available at* https://www.ussc.gov/research/quick-facts/section-922g-firearms. That same year, though, the population of the United States was 12.1% Black. U.S. Dep't of Health and Human Servs., Office of Minority Health, *Profile: Black/African Americans* (last modified Feb. 24, 2023). African Americans' share of Section 922(g) convictions is therefore over four times their representation in the national population. The result is that "nearly a quarter of Black adults have been permanently stripped of the right to lawfully possess firearms." Zach Sherwood, *Time to Reload: The Harms of the Federal Felon-in-Possession Ban in A Post-Heller World*, 70 Duke L.J. 1429, 1464 (2021).")

defense. Accordingly, the Court finds that Section 922(g)(1) is not analogous to discriminatory regulations regarding slavery and Native Americans.

To soften their disturbing line of argument, the government follows with historical instances where the colonies specifically disarmed "free, Christian, white men," "whom the authorities believed could not be trusted to obey the law." *Id.* at 21; *Range*, 69 F.4th 96 at 122 (Krause, J., dissenting) (citing Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 174 (3d ed. 2022)). The government also highlights Revolutionary disarmament laws targeting those who failed to demonstrate loyalty to the emerging American government. [Dkt 71 at 22]. A common feature of these laws was to require oaths of loyalty to the government and strip anyone who failed or refused to take the oath of the right to bear arms. *Atkinson*, 70 F.4th at 1034 (Wood, J., dissenting) (explaining "[d]uring the American Revolution, several states passed laws providing for the confiscation of weapons owned by persons who refused to swear an oath of allegiance to the state or to the United States.").

The Court does find that the laws disarming British loyalists are a proper historical analogue. The historical record supports a finding that legislatures categorically disarmed individuals who they feared would disregard the law and disturb the social order. The Court finds that a historical rationale exists for disarmament based on perceived danger. Although these predecessors do not apply specifically to felons, *Bruen* clarifies that "analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin" and "[s]o even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." 142 S. Ct. at 2133; *See also United states of America v. Johnny Anderson*, No. 1:22-CR-00594, 2023 WL 7531169, at *9 (N.D. Ill. Nov. 13, 2023) (Gettleman, J.) ("loyalty oath laws . . . are the strongest analogue to § 922(g)(1).").

Griffin critiques the British loyalist dispossession laws as dissimilar to Section 922(g)(1). Griffin claims that Section 922(g)(1) is a total and permanent ban on firearm ownership, with no exceptions while British loyalists could carry firearms if they signed a loyalty oath. Because the government's analogue contains exceptions allowing "untrustworthy adherents to the law" to possess firearms, Griffin argues that Section 922(g)(1) cannot "impose a comparable burden on the right of armed self-defense." *Bruen*, 142 S. Ct. at 2133.

The Court rejects Griffin's characterization of Section 922(g)(1) as having no exceptions. In fact, felons may regain their right to possess firearms if they were pardoned or their conviction was expunged. 18 U.S.C. § 921(a)(20); *see Atkinson v. Garland*, 70 F.4th 1018, 1026 (7th Cir. 2023) (Wood, J., dissenting). The statutory scheme also leaves open the possibility for felons to seek administrative relief and regain their right to bear arms. 18 U.S.C. § 925(c) ("The Attorney General may grant such relief if it is established to his satisfaction that the circumstances regarding the disability, and the applicant's record and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest.").[3] These exceptions demonstrate that Section 922(g)(1) imposes a "comparable burden" on the right to bear arms as the British loyalist historical analogue as required by *Bruen*, 142 S. Ct. at 2133. *United States v. King*, No. 23 CR 143, 2023 WL 7936754, at *1 (N.D. Ill. Nov. 17, 2023) (Bucklo, J.) (explaining "[t]here is no incongruity in the burdens imposed by § 922(g)(1) and the historical examples the government brings forth.") Accordingly, the British loyalist dispossession laws are a proper historical analogue to Section 922(g)(1).

---

[3] While it is true that felons can theoretically regain their rights under this provision, it has been acknowledged by the Supreme Court that Congress has blockaded this route to relief for more than a quarter of a century. *See Logan v. United States*, 552 U.S. 23, 28 n.1, 128 S. Ct. 475, 480, 169 L. Ed. 2d 432 (2007) ("The relief provision has been rendered inoperative, however, for Congress has repeatedly barred the Attorney General from using appropriated funds "to investigate or act upon [relief] applications."); See also Kari Lorentson, *18 U.S.C. § 922(g)(1) Under Attack: The Case for As-Applied Challenges to the Felon-in-Possession Ban*, 93 Notre Dame L. Rev. 1723, 1726-28 (2018).

13

Finally, the government argues that English and early American laws authorizing capital punishment and estate forfeiture for felony convictions is a proper historical analogue to Section 922(g)(1). *See* 4 William Blackstone, *Commentaries on the Laws of England* at 95 (1769). The government reasons that if the founders could exercise the right to impose capital punishment on criminals, they also could exercise the right to disarm felons. *See* [Dkt 71 at 29] (citing *Range*, 69 F.4th at 126-27 (Krause, J., dissenting) ("[T]he ubiquity of the death penalty suggests that the Founding generation would have had no objection to imposing on felons the comparatively lenient penalty of disarmament.").

The Court rejects the government's argument that English and early American laws authorizing capital punishment and estate forfeiture for felony convictions are a proper historical analogue to Section 922(g)(1). This Court sees no comparison and strongly disagrees that the authority to impose the death penalty implies a lesser right to disregard the fundamental rights of felons. *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 105 (3d Cir. 2023) ("founding-era governments' execution of some individuals convicted of certain offenses does not mean the State, then or now, could constitutionally strip a felon of his right to possess arms if he was not executed."). Accordingly, the Court finds that this argument fails.

**4. Whether These Analogues Supply a Sufficient Historical Tradition.**

Having established British loyalist laws are analogous, the Court must next determine if these laws supply enough of a historical tradition as opposed to an isolated historical incident to support Section 922(g)(1). Here, the history shows that British loyalist dispossession laws were prominent during the Revolutionary era across the colonies. *See United States v. Jackson*, 69 F.4th 495, 503 (8th Cir. 2023) (explaining "[i]n the era of the Revolutionary War, the Continental Congress, Massachusetts, Virginia, Pennsylvania, Rhode Island, North Carolina, and New Jersey prohibited possession of firearms by people who refused to declare an oath of loyalty."); 4 *Journals of the*

14

*Continental Congress 1774-1789*, at 205 (1906) (resolution of Mar. 14, 1776); 5 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 479- 84 (1886) (1776 Mass. law); 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (1862) (1776 R.I. law); 1 *The Public Acts of the General Assembly of North Carolina* 231 (1804) (1777 N.C. law). The Court finds that this well-established record supplies a sufficient historical tradition to support enforcement of Section 922(g)(1).

### 5. As Applied Challenge: Whether History Supports an Individualized Assessment or a Distinction between Violent and Non-Violent Felonies.

Finally, the Court addresses whether the established history supports an individualized assessment in its applications towards felons. First, the Government claims that Griffin proffered no historical evidence to support a position that the constitutionality of § 922(g)(1) turns on individualized assessments. The Court disagrees. Griffin highlighted an exception to the British loyalist dispossession laws allowing British loyalists to possess firearms if they signed loyalty oaths. *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 L. & Hist. Rev. 139, 157 (2007). This exception necessarily requires an individualized assessment to determine if a former British loyalist is so "untrustworthy" or "dangerous" that they should be barred from possessing a weapon. Thus, to the extent the exception shows that some British loyalists were permitted to carry firearms despite the general prohibition, the Court interprets this history as supporting an individualized assessment under the analogue and therefore under Section 922(g)(1).

Second, the government argues that even assuming the historical tradition supports disarming only "dangerous" individuals, Griffin proffered no historical evidence to support a position that the definition of "dangerous" is limited to the use, attempted use, or threatened use of force. The government asserts that there is a historical tradition of disarming felons who demonstrate even the risk of violence. The Court notes that *Atkinson* requires this Court to

15

determine whether the history supports a distinction for violent and non-violent felonies and how history defines a non-violent felony; our inquiry need not be limited to "dangerous" felonies. *Atkinson*, 70 F.4th at 1024. While the Court agrees that no evidence has been presented limiting the definition of non-violent felony as "dangerous," it seems clear that any definition of "dangerous" would include individuals who demonstrate the risk of violence. *See People v. Brown*, 2016 IL App (1st) 140577-U, 2016 WL 4586056, at *5 (Ill. App. 1 Dist., 2016) (reviewing citation to Merriam–Webster dictionary for "dangerous" as "able or likely to inflict injury or harm."). Based on the government's historical analogue, it seems that where exceptions were made that allowed formerly "untrustworthy" British loyalists to possess weapons, the individuals who fell within the exception were determined to be non-violent during their individual assessments permitting them to carry firearms.

       The Court now turns to Griffin's as-applied challenge to the felon-dispossession statute's constitutionality. In support of its argument that Griffin demonstrates a risk of violence, the government claims that Griffin has an extensive criminal history that includes multiple felony convictions for narcotics and firearms offenses. In truth, Griffin's felony convictions were for robbery, criminal trespass, and possession of controlled substances. There is no dispute that this type of evidence the government has advanced may be considered by the Court in determining whether a defendant demonstrates a risk of violence. The Seventh Circuit has held that robbery under Illinois law is a violent felony under the Armed Career Criminal Act. *See United States v. Watson-El*, 376 F. App'x 605, 608 (7th Cir. 2010). The Court notes, however, Griffin's criminal record shows he has never been convicted of a crime *involving the use of a weapon.* Even in the present case, Griffin was not arrested in the commission of a violent act; rather, he was arrested for smoking marijuana in his illegally parked car while in mere possession of a firearm. The Court finds that this conduct does not demonstrate a risk of violence. Further, Griffin's felony conviction for robbery

16

occurred over 10 years ago when Griffin was 25 years old and *did not include a weapon*. His most recent felony conviction for possession of a controlled substance also does not demonstrate a risk of violence. While the Court acknowledges that Griffin, now age 35, does not have a "clean" record, the Court finds that Griffin's criminal record, containing no improper use of a weapon, as well as the non-violent circumstances of his arrest do not support a finding that he poses a risk to public safety such that he cannot be trusted to use a weapon responsibly and should be deprived of his Second Amendment right to bear arms in self-defense. Thus, this Court finds that, as applied to Griffin, Section 922(g)(1) is unconstitutional.

**Conclusion**

The felon firearm-dispossession statute, 18 U.S.C. § 922(g)(1), violates the Second Amendment as applied to Griffin. Thus, the Court grants Griffin's motion to dismiss.

**IT IS SO ORDERED.**

Date: 11/30/2023　　　　　　　　　　　　Entered: _____

　　　　　　　　　　　　　　　　　　　　　　　SHARON JOHNSON COLEMAN
　　　　　　　　　　　　　　　　　　　　　　　United States District Judge